UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KEUNE HAIRCOSMETICS USA, INC.,

   - and -

KEUNE IP B.V.,

    Plaintiffs,

v.

LIFE OF RILEY SALON SUPPLY, LLC;
WINFIELD BEAUTY SOLUTIONS, INC.;
WINFIELD BEAUTY HOLDINGS, LLC;
WINFIELD EQUITY, LLC;
CHRISTOPHER BRENES;
HUNTER HANSON;

   - and -

SCOTT JENSEN

    Defendants.

_____

Case No.: _____

## **COMPLAINT**

Plaintiffs, Keune Haircosmetics USA, Inc. ("Keune USA"), and Keune IP B.V. ("Keune IP") (collectively, "Keune" unless otherwise noted), by and through their counsel, Thomas & LoCicero PL and Barton Cerjak S.C., hereby sue Defendants, Life of Riley Salon Supply, LLC ("Riley"), Winfield Beauty Solutions, Inc. ("WBS"), Winfield Beauty Holdings, LLC ("WBH"), Winfield Equity, LLC ("Winfield" and together with WBS and WBH, the "Winfield Entities"), Scott Jensen ("Jensen"), Christopher Brenes ("Brenes"), and Hunter Hanson ("Hanson" and together with Jensen and Brenes, the "Winfield Partners") (collectively, "Defendants"), and allege as follows:

## INTRODUCTION

1.     This case arises from Defendants' deliberate decision to ignore clear contractual limits and continue profiting from a brand they no longer had a right to sell, market, or distribute.

2.     For years, Keune entrusted Riley with the limited privilege of distributing Keune's products under a tightly controlled distribution agreement (the "Agreement") designed to protect Keune's premium, professional-only brand. But once Riley was acquired by the Winfield Partners through the Winfield Entities, Riley broke that deal. It engaged in unauthorized sales, failed to meet its financial obligations, and triggered Keune's contractual right to immediately terminate the Agreement. That should have been the end of the story, but Defendants had different ideas.

3.     Indeed, rather than comply with Riley's obligations under the Agreement and effectuate an orderly wind-down of the parties' relationship, Defendants did what they were never permitted to do: they continued to market, advertise, and sell Keune products, slashed prices to liquidate inventory, and used Keune's trademarks to create the false impression that Riley—the company operated by the Winfield Partners through the Winfield Entities—was still authorized. This was not a misunderstanding. It was a calculated decision to exploit Keune's brand for as long as possible after Riley's rights under the Agreement had been revoked.

4.     Simply put, Defendants' conduct is as straightforward as it is unlawful. A terminated distributor cannot keep trading on another company's name, cannot ignore contractual restrictions, and cannot manufacture marketplace confusion for

2

profit. Because Defendants chose to do all three—deliberately and in concert—this lawsuit seeks to hold them accountable for their malfeasance, which is flatly prohibited under the Lanham Act, 15 U.S.C. §§ 1051, *et seq.*, and the plain terms of the parties' contract.

**PARTIES**

5. Plaintiff, Keune Haircosmetics USA, Inc. is a Georgia corporation with its principal offices located at 1440 Lakes Parkway, Lawrenceville, Georgia 30043.

6. Plaintiff, Keune IP B.V., is a foreign company (Besloten Vennootschap) organized under the law of the Netherlands, with its principal office located at Koningsweg 15, 3762 EA Soest, Netherlands.

7. On information and belief, Defendant, Life of Riley Salon Supply, LLC, is a Florida limited liability company with its principal office located at 12955 Starkey Road Suite 3000, Largo, Florida 33773.

8. On information and belief, Defendant, Winfield Beauty Solutions, Inc., is a Delaware corporation with its principal place of business located at 13228 SE 30th Street Suite C1, Bellevue, Washington 98004.

9. On information and belief, Defendant, Winfield Beauty Holdings, LLC is a Delaware limited liability company with its principal place of business located at 13228 SE 30th Street Suite C1, Bellevue, Washington 98004.

10. On information and belief, Defendant, Winfield Equity, LLC, is a Washington limited liability company with its principal place of business located at 13228 SE 30th Street Suite C1, Bellevue, Washington 98004.

11.     On information and belief, Defendant, Scott Jensen, is an adult resident of the state of Utah, a member/partner of Winfield, a member of WBH, a member of WBS's board of directors, and a manager of Riley.

12.     On information and belief, Defendant, Christopher Brenes, is an adult resident of the state of Washington, a member/partner of Winfield, a member of WBH, president of WBS, and a manager of Riley.

13.     On information and belief, Defendant, Hunter Hanson, is an adult resident of the state of Washington, a member/partner of Winfield, a member of WBH, a member of WBS's board of directors, and a manager of Riley.

**JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction under 15 U.S.C. §§ 1121, 1125(a) and 28 U.S.C. §§ 1331, 1338(a) based on Plaintiffs' assertion of the Lanham Act claims set forth herein, and supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a).

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Riley is headquartered in this judicial district and it is the location where a substantial part of the events giving rise to Plaintiffs' claims occurred.

16.     This Court has specific personal jurisdiction over Defendants because this action arises from Defendants' Florida-directed business activities and Florida-directed tortious conduct, including Defendants' operation, management, control, and exploitation of Riley's Florida-based distribution business and Defendants' post-termination advertisement, marketing, offer for sale, and sale of Keune products from

4

Riley's Florida operations, including but not limited to the distribution of Keune's products from Riley's warehouse in Largo, Florida using the Keune Marks (defined *infra*) without authorization.

17. This Court has personal jurisdiction over Riley because Riley is a Florida limited liability company headquartered in this District, conducts business in Florida, and entered into and performed the Agreement through its Florida-based distribution operations. Plaintiffs' claims arise from Riley's Florida-directed business activities and tortious conduct, including Riley's post-termination advertising, marketing, offer for sale, and sale of Keune products using the Keune Marks without authorization.

18. This Court has personal jurisdiction over WBS because WBS purposefully availed itself of Florida by acquiring, managing, and operating Riley, a Florida limited liability company headquartered in this District, as part of WBS's salon-distribution platform. Plaintiffs' claims arise from WBS's Florida-directed business activities and tortious conduct, including WBS's control over Riley's sales, marketing, inventory, website operations, and post-termination sale of Keune products using the Keune Marks without authorization.

19. This Court has personal jurisdiction over WBH because WBH purposefully availed itself of Florida by owning, managing, and controlling WBS and Riley as part of the Winfield Entities' salon-distribution platform, including Riley's Florida-based distribution business headquartered in this District. Plaintiffs' claims arise from WBH's Florida-directed business activities and tortious conduct, including

5

its supervision, authorization, ratification, and financial benefit from Riley's post-termination advertising, marketing, offer for sale, and sale of Keune products using the Keune Marks without authorization.

20. This Court has personal jurisdiction over the Winfield Partners because they purposefully availed themselves of Florida by managing, controlling, and operating Riley's Florida-based distribution business, including through their roles as Riley's managers and as officers, directors, members, governors, and/or partners of the Winfield Entities. Plaintiffs' claims arise from the Winfield Partners' Florida-directed business activities and tortious conduct, including their authorization, direction, ratification, and/or control of Riley's post-termination advertising, marketing, offer for sale, and sale of Keune products using the Keune Marks without authorization.

21. This Court has personal jurisdiction over Winfield because Winfield purposefully availed itself of Florida by using the Winfield Entities and the Winfield Partners to acquire, manage, finance, control, and profit from Riley's Florida-based distribution business as part of Winfield's salon-distribution rollup strategy. Plaintiffs' claims arise from Winfield's Florida-directed business activities and tortious conduct, including Winfield's authorization, direction, ratification, and/or financial benefit from Riley's post-termination advertising, marketing, offer for sale, and sale of Keune products from Riley's Florida operations using the Keune Marks without authorization.

## FACTUAL ALLEGATIONS

### *Keune's Corporate History*

22. Keune Haircosmetics is a Dutch, family-owned haircare company whose origins trace back to 1922, when Jan Keune, a pharmacist in Amsterdam, began experimenting with hair treatments above the drugstore he ran with his wife, Cornelia.

23. Since its humble beginnings more than a century ago, Keune has grown into the Netherlands' largest manufacturer of professional hair products, in which it develops, distributes, and sells these products from its global headquarters in Soest, approximately 40km east of Jan's original drugstore in Amsterdam.

24. Given Keune's longstanding presence as a leader in the haircare industry, the Dutch Monarchy granted Keune the right to use the "Royal Predicate" in 2022, an honor reserved for companies of national importance with a history of at least one hundred years.

25. Keune's generational success is attributable, in large part, to its unwavering commitment to the hair professionals who use its products. Indeed, a central element of Keune's business model has been its near-exclusive focus on distributing its products only to hairdressers rather than through mass retail channels. In parallel, Keune has invested heavily in education and training, developing academies and instructional programs worldwide to support hairstylists and maintain close relationships with salon professionals.

7

26. All told, Keune's longstanding business strategy has not only reinforced Keune's commitment to the professionals who use its products but underscores its identity in the marketplace as a premium, professional-grade brand.

27. Despite its multi-national footprint, however, Keune remains a family-owned business that operates through a vertically integrated structure in which various wholly-owned subsidiaries and affiliate entities—all operating under the "Keune" brand—import, distribute, and sell Keune's product to more than eighty-five countries worldwide and undertake significant efforts to promote, grow, and protect Keune's brand and intellectual property.

28. Relevant here, the parent entity of the Keune enterprise, Royal Keune Holding B.V., is a privately-held Dutch company owned by the Keune family, and which wholly owns numerous subsidiaries operating under the Keune umbrella, including: (a) Keune Haircosmetics Manufacturing B.V. (Keune's manufacturing arm based in the Netherlands); (b) Keune IP B.V. (Keune's intellectual property holding company based in the Netherlands, which owns, holds, and enforces certain IP rights on behalf of Keune); and (c) Keune Haircosmetics USA, Inc., the exclusive North American distributor/importer of Keune's products for decades, which is vested with exclusive authority to market, distribute, and sell Keune's products in the North American market (collectively, "Keune" unless otherwise noted).

*Keune's Distribution Of Its Products & Use Of Its Marks In America*

29.     As noted above, Keune operates and maintains a worldwide distribution network of its hair products, including in the United States through Keune USA, which has the exclusive right to import, distribute, and sell Keune's products in the North American market.

30.     In connection with Keune USA's distribution of the company's products—and given its corporate structure as a wholly-owned subsidiary of Royal Keune—Keune USA is also authorized to use Keune's intellectual property, including Keune's trademarks, in connection with promoting the sale of Keune's hair products in the North American market.

31.     In approximately 2016, as part of corporate restructure to more easily manage Keune's IP portfolio worldwide, Keune's trademarks were assigned to Keune IP, which is now deemed the "registrant" of Keune's trademarks with the United States Patent and Trademark Office ("USPTO").

32.     Today, Keune IP is the owner of several inherently distinctive, strong marks (collectively, the "Keune Marks"), including the following  marks that are registered with the USPTO: (i) KEUNE (Registration No. 1,545,976, which is uncontestable); (ii) KEUNE (Registration No. 7,709,204); and (iii) TINTA COLOR (Registration No. 5,268,519, which is uncontestable) (collectively the "Registered Marks").

33. Keune does not sell, supply, or distribute the majority of its products through mass retail or open consumer channels. Instead, consistent with its longstanding business practice, Keune distributes its products in North America (via Keune USA) through a controlled network of authorized distributors, who then resell Keune products to professional hair salons.

34. Keune grants those distributors carefully circumscribed rights to purchase Keune products and resell them only within defined territories and only to authorized professional customers.

35. The purpose of this model is straightforward: to protect Keune's trademarks, goodwill, and brand positioning, and to prevent diversion (gray-market sales) and erosion of Keune's brand value.

### *Keune USA's Distribution Relationship With Riley*

36. One of Keune USA's longstanding (now former) distributors is Riley, a product distributor in the beauty industry that operates as an intermediary between Keune and the salons in Riley's territory that acquired Keune's products.

37. Riley markets itself as part of a broader "Riley" network of salon distributors operating under similar branding in multiple states, including affiliated or similarly named entities in Louisiana and elsewhere.

38. Through this network, Riley sells professional haircare products to salons and other professional customers, and in some instances through sub-distributors operating under the "Riley" name.

39.    Riley and Keune USA executed a Distribution Agreement in 2013, which carefully defined the scope of Riley's rights—and, just as importantly, its limitations. A true and correct copy of this Distribution Agreement (the "Agreement") is attached hereto as ***Exhibit 1***.

40.    Pursuant to the Agreement, Riley was authorized to distribute Keune's products within a defined territory set forth in the parties' contract, only through approved professional channels, and only so long as it complied with Keune's brand-protection, purchasing, and payment requirements.

41.    The Agreement was for an initial, three-year term, which renewed annually thereafter if the parties reached an agreement on Riley's Minimum Purchase Requirement ("MPR"), discussed *infra*, for the year; if an agreement was not reached on Riley's MPR, the Agreement would expire. (*See* Ex. 1 (the "Agmt."), § 4.)

42.    The Agreement could also be terminated without cause through written notice within 90 days before the end of the contract period or for cause at any time in accordance with Section 10. (*Id.* § 4.)

43.    The Agreement granted Riley a limited right to distribute Keune products within a defined territory set forth in Exhibit B to the Agreement and pursuant to certain "Distribution Requirements," which were specified in Exhibit C of the Agreement. (*See generally* Agmt.)

44.    Riley was not authorized to sell outside that territory, nor to expand its distribution through unapproved channels or affiliates. (*Id.*)

11

45.    Further, Section 3 of the Agreement expressly required Riley's sales of Keune products to be sold through professional hairdressing salons and via its professional hairdresser-only outlets. (*Id.* § 3.)

46.    Section 3 further prohibited diversion, unauthorized resale, and any sales inconsistent with Keune's professional-only distribution model and further specified that those same prohibitions would be imposed on any of Riley's sub-distributors, subagents, or sales reps. (*Id.* § 3.)

47.    The Agreement also tethered Riley's distribution rights to performance obligations that Riley was required to meet. Specifically, Riley was obligated to comply with Keune's sales, marketing, and brand guidelines; to conduct its business in a manner that protected Keune's trademarks and goodwill; and to maintain compliance with Keune's operational requirements. (*Id.* § 5.)

48.    Riley's contractual obligations under Section 5 also required it to pay for all products it purchased from Keune within 30 days of shipment.

49.    And because Keune's financial performance is tied, in large part, to the success of its distributors in selling Keune's product to salons, Riley—like all Keune distributors—committed to: (i) meet certain defined minimum purchase requirements ("MPRs"), which were set annually; and (ii) timely pay for those purchases. (*Id.* § 8.)

50.    Pursuant to Section 8, Riley also agreed that if it does not timely pay Keune for all orders and Keune collects payment by or through an attorney, Riley will pay costs of collection and reasonable attorneys' fees. (*Id.* § 8(b).)

12

51.     The Agreement provided that at the end of the first six (6) months of each subsequent twelve-month period, Riley was required to order and pay for at least 45% of that year's minimum order. (*Id.* § 8(a).)

52.     These MPRs were not aspirational; failure to meet these performance metrics constituted a material breach of the Agreement. (*See id.* § 8(b) ("Timely payment by [Riley] to [Keune] as to all orders is of the essence."); *see also id.* § 10 (discussing termination).)

53.     Protecting Keune's intellectual property was also critical. Section 9 granted Riley a limited, royalty-free license to use Keune's Marks while Riley was an active distributor of Keune's products. Upon termination of the Agreement, however, Riley's "*rights to use the Trademarks immediately cease[d]*." (*Id.* § 9 (emphasis added).)

54.     Section 10 authorized Keune to terminate the Agreement for cause if, amongst other reasons, Riley: (i) materially breached the Agreement and the breach was not cured within sixty (60) days after notice was furnished; or (ii) failed to satisfy its MPRs, in which case no right to cure was required. (*Id.* § 10.)

55.     Exhibits B and C to the Agreement, as well as its Addendum, supplemented these core provisions by defining authorized products, pricing, and additional operational requirements specific to the parties' relationship. Taken together, the Agreement reflected a straightforward bargain: Riley could profit from distributing a premium professional brand, provided it honored Keune's channel restrictions, brand protections, and payment obligations.

56. Riley was initially granted the exclusive right to distribute Keune's products throughout the state of Florida—including Hillsborough County, in which this Court is located—except for seven counties in Southern Florida that were subject to a non-exclusive, co-distribution arrangement (the "Territory").

57. Over time, Riley's Territory expanded to include the right to distribute Keune's products in the following locations: (i) the State of Louisiana on an exclusive basis; (ii) the State of North Dakota on an exclusive basis; (iii) the state of South Dakota on an exclusive basis; (iv) the territory of Puerto Rico on an exclusive basis; (v) southern Alabama on an exclusive basis; (vi) southern Mississippi on an exclusive basis; and (vii) western Nebraska, albeit on a non-exclusive, co-distribution basis.

58. To properly service its expanded Territory and distribute Keune's products in accordance with the Agreement, Riley also appointed sub-distributors in certain locations.

59. Pursuant to the Agreement, however, Riley's appointment of any sub-distributor required Keune USA's authorization, which further necessitated the sub-distributor to agree to the Agreement's distribution requirements and prohibitions. (*See id.*, § 3 (noting that Riley "shall have a written agreement with any such sub-distributor, agent, or sales rep containing the provisions in this Agreement and such sub-agreement shall always be subject to the expiration, termination and other provisions in this Agreement").)

60.　　Despite the expansion of its Territory and the appointment of certain sub-distributors, however, Riley's sales force remained responsible for its sales in Florida, which remained the primary revenue center for the sale of Keune's products.

61.　　Indeed, on information and belief, Riley's Florida-based sales of Keune's products accounted for more than 70% of all Keune-related revenue that Riley generated in the years preceding the termination of the Agreement (discussed *infra*).

***The Winfield Entities Enter The Haircare Distribution Business & Acquire Riley***

62.　　On information and belief, in approximately 2023, the Winfield Partners, through Winfield, began exploring potential opportunities in the beauty products distribution industry.

63.　　The Winfield Partners each work at Winfield, which is a private equity ("PE") firm based in Bellevue, Washington.

64.　　Winfield's 2025 Annual Report on the Washington Secretary of State's website also reveals that the Winfield Partners are each "governors" of Winfield:

GOVERNORS

| Title | Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | INDIVIDUAL | | CHRIS | BRENES |
| GOVERNOR | INDIVIDUAL | | SCOTT | JENSEN |
| GOVERNOR | INDIVIDUAL | | HUNTER | HANSON |

65.　　On information and belief, because Brenes, Jensen, and Hanson are each designated as governors of Winfield, they are the Winfield Partners responsible for managing and exercising control over Winfield as well as the company's investments, which are made through one or more entities affiliated with Winfield, including WBS

and WBH, as further discussed below. *See* RCW § 23.95.105(12) (defining a "governor" to include, *inter alia*, "[a] manager of a manager-managed limited liability company; [a] member of a member-managed limited liability company; . . . or [a]ny other person under whose authority the powers of an entity are exercised and under whose direction the activities and affairs of the entity are managed pursuant to the organic law and organic rules of the entity").

66.    Given Winfield's PE focus, on information and belief, the Winfield Partners sought to effectuate a rollup strategy in the beauty distributor industry whereby they would acquire various beauty distributors across the United States and consolidate these distributors' operations into a single operating company (WBS) to increase efficiencies and the resultant profit margins associated with the investment.

67.    Rollup strategies are commonplace in the PE world. The strategy presupposes that the increased revenue derived from the PE firm's acquisition of numerous similar companies in the same industry—coupled with projected operational synergies gained through consolidation—can reduce overhead and increase EBITDA, all of which makes the consolidated entity attractive to a new buyer when the PE firm seeks to exit the investment.

68.    In connection with this process, WBS was incorporated as a Delaware corporation and WBH was organized as a Delaware limited liability company, both of which occurred on April 25, 2023.

16

69.    On information and belief, WBS was incorporated to serve as the operating company central to Winfield's rollup strategy, which is managed and controlled by Winfield Partners.

70.    On information and belief, WBH was organized to serve as WBS's parent company through which WBS's profits would flow and be distributed to Winfield's investors, including Winfield and the Winfield Partners.

71.    Thereafter, on or about May 8, 2024, WBS (f/k/a Winfield, Beauty, Inc.) acquired Riley and Riley's sole member (LOR Distribution, LLC) pursuant to a Membership Interest Purchase Agreement (the "Purchase Agreement"), a copy of which was filed in connection with the *Huether* Litigation (defined *infra*).

72.    As Exhibit B to the Purchase Agreement reflects, Jensen and Brenes were designated as WBH's "directors" under WBH's operating agreement, who were responsible for exercising management and control over WBH:

| COMPANY | COMPANY |
|---|---|
| WINFIELD BEAUTY HOLDINGS, LLC | WINFIELD BEAUTY HOLDINGS, LLC |
| By: *Chris Brenes* <br> Name: Chris Brenes <br> Title: Director | By: _____ <br> Name: Chris Brenes <br> Title: Director |
| By: _____ <br> Name: Scott Jensen <br> Title: Director | By: *[signature]* <br> Name: Scott Jensen <br> Title: Director |

73.    On information and belief, Hanson joined Winfield in November 2023 and became a director of WBH around this time, as evidenced by the operation and control he subsequently exercised over WBS and Riley as discussed below.

17

74.    According to documents maintained on the Florida Secretary of State's website, WBS—the consolidated operating company for Winfield's beauty distributor investment—serves as Riley's manager, as reflected in Riley's 2026 Annual Report:

| **2026  FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT** | **FILED** |
|---|---|
| DOCUMENT# L13000083010 | **Jan 17, 2026** |
| **Entity Name:** LIFE OF RILEY SALON SUPPLY, LLC | **Secretary of State** |
| | **4797108549CC** |
| **Current Principal  Place of Business:** | |
| 12955 STARKEY ROAD SUITE 3000 | |
| LARGO,  FL  33773 | |
| **Current Mailing Address:** | |
| 12955 STARKEY ROAD SUITE 3000 | |
| LARGO,  FL  33773  US | |
| **FEI Number: 90-0993455** | **Certificate of Status Desired:** No |
| **Name and Address of Current Registered Agent:** | |
| CHESTNUT BUSINESS SERVICES, LLC | |
| 911 CHESTNUT ST. | |
| CLEARWATER, FL  33756  US | |

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

Electronic Signature of Registered Agent                                  Date

**Authorized Person(s) Detail :**

| Title | MANAGER |
|---|---|
| Name | WIN BEAUTY SOLUTIONS |
| Address | 13228 SE 30TH STREET UNIT 1 |
| City-State-Zip: | BELLEVUE  WA  98004 |

75.    Further, in Defendants' Notice of Removal that was filed in the *Missad* Litigation (defined *infra*), Jensen and Brenes each averred that WBS is Riley's sole member and that they also serve as managers of Riley. (*See Missad* Litig., ECF No. 1-2, ¶¶ 3-5 (Brenes); *see also id.*, ECF No. 1-3, ¶¶ 3-5 (Jensen).)

76.    Brenes also attested to his role as "President" of WBS and Jensen explained that he serves as a member of WBS's Board of Directors. (*See id.*)

77.    On information and belief, when Hanson joined Winfield in November 2023, he was also designated as a manager of Riley and a corporate officer of WBS, as

evidenced by his integral involvement in the operation and control of Riley and the Winfield Entities since he joined Winfield.

78. Indeed, not only did Hanson hold himself out to Keune USA as the Winfield Partner who was managing Riley following a rash of departures (*see infra*), but Hanson's LinkedIn profile explains that he has been a "Partner" in Winfield and WBS since November 2023:

79. Defendants' Corporate Disclosure Statement in the *Missad* Litigation also reflects that WBS is a wholly owned subsidiary of WBH:

19

80.    As noted above, the Winfield Partners control WBH and, on information and belief, also own a majority interest in WBH, either directly or vis-à-vis their ownership in Winfield.

81.    The declarations that Brenes and Jensen submitted in connection with Defendants' Notice of Removal in the *Missad* Litigation also reflect that despite Riley's longstanding presence in Florida, its "principal place of business is located in Washington because [Riley's] corporate functions are centrally managed from WBS headquarters in Washington." (*See Missad* Litig., ECF No. 1-2, ¶ 6 (Brenes); *see also id.*, ECF No. 1-3, ¶ 6 (Jensen).)

82.    Thus, it appears that following Winfield's entrance into the beauty distributor industry, Riley, WBS, and WBH have been principally operated by the Winfield Partners out of Winfield's headquarters in Bellevue, Washington.

83.    After creating WBS and WBH, Winfield entered the professional salon distribution market to effectuate its rollup strategy of acquiring and consolidating regional distributors into a single, centrally managed network.

84.    As noted above, in May 2023, WBS acquired Riley that was previously owned and operated by Kelly Huether and Robert Larson.

85.    Shortly after acquiring Riley, WBS acquired Classic Beauty Supply ("CBS"), publicly describing the CBS transaction as an expansion of the Riley footprint, which added more states, consultants, and sub-distributors to the Riley platform.

20

86.    Months later, WBS acquired Modern Salon Services, another multi-state professional distributor, based in Kansas City, Missouri.

87.    WBS characterizes its role not as a passive investor, but as the "driving force behind a successful network of professional salon distributors, including Modern Salon Services and Riley Salon Resources," combining "the resources and sophistication of large national distribution companies with the personal touch of local independent distributors."

88.    On information and belief, and consistent with the corporate structure described above, Riley operates as part of a centrally-managed distribution platform controlled by the Winfield Partners through their operation and control of WBS, WBH (WBS's parent company), and Winfield (the Winfield Partners' PE firm who made the investment).

89.    Thus, on information and belief, Jensen, Hanson, and Brenes—in their respective capacities as the Winfield Partners—exercise common control over Riley, WBS, and WBH, and use those entities in a coordinated manner to own, manage, finance, and operate the Riley distribution business.

90.    On information and belief, however, none of the Winfield Partners are W-2 employees of Riley, WBS, or WBH.

91.    Rather, on information and belief, the Winfield Partners are employed by, and principally operate Winfield, the PE Firm through which they manage and

21

control all of their investments, including their investment into the beauty distribution industry vis-à-vis WBS and WBH.

92. The upshot is that following WBS's acquisition of Riley in May 2023, Riley no longer operated as a fully independent entity.

93. Rather, on information and belief, all material decisions related to Riley's sales, marketing, and financial matters are subject to the oversight, approval, and control of the Winfield Partners, through their ownership and operation of the Winfield Entities; that is, the entities ultimately benefiting from the income generated by Riley and the other distributors under the WBS umbrella as a result of Winfield's entrance into the beauty distribution industry.

94. Although the Winfield Partners exercise control over Riley from Winfield's headquarters in Washington according to Brenes and Jensen's filings in the *Missad* Litigation, it is undisputed that even after the acquisition, Riley maintained an active presence in Florida where its office and other key employees were located, such as Amanda Lussier (Riley's Vice President of Sales) and Chase Ridenour (Riley's Director of Operations).

95. Further, Riley's primary warehouse where it maintained its inventory of Keune products and from which it processed and shipped the Keune inventory that Riley sold, was located in Largo, Florida.

96. Accordingly, despite the Winfield Partners' control over Riley's affairs from Winfield's office in Washington, they each regularly traveled to Florida to meet

22

with other Riley personnel. Indeed, on information and belief, each of the Winfield Partners traveled to Florida in early January for a meeting with various Riley personnel to discuss the status of the business, as well as the disposition of Riley's remaining stock of Keune's inventory, which is the subject of the claims asserted herein.

### *Riley Breaches The Agreement, Forcing Keune To Terminate It*

97.    By mid-2025, the Keune-Riley relationship began to unravel, which coincided with a period when Riley was also in the midst of internal turmoil.

98.    Kelly Huether ("Huether"), a 34-year veteran of the beauty industry and Riley's longtime former owner, was terminated as a WBS executive in February 2024 less than a year after the Riley transaction closed.

99.    Scott Missad ("Missad"), the executive tapped to initially run WBS as its CEO following Winfield's investment into the beauty distribution industry, was then terminated fifteen months later in May 2025.

100.    Thereafter, Jack Stephenson—who, on information and belief, also works at Winfield—was then held out as WBS's new CEO in the Summer of 2025.

101.    By the Fall of 2025, however, Stephenson was replaced by Hanson, who, on information and belief, has undertaken primary responsibility for operating WBS, WBH, and Riley (along with Jensen and Brenes, who serve as Riley's other managers, as well as officers and directors of WBS and WBH).

102. WBS and Riley are now mired in litigation against Missad and Huether, both of whom filed lawsuits alleging a pattern of discrimination and broken promises. *See Huether v. Win Beauty Solutions, Inc.*, Case No. 8:25-cv-2900-WFJ-NHA (M.D. Fla.) (the "Huether Litigation"); *see also Missad v. Win Beauty Solutions, Inc. et al.*, Case No. 1:25-cv-01286 (W.D. Mich.) (the "Missad Litigation").

103. In late July 2025, as these disputes began to percolate, Keune USA learned that Riley was making unauthorized sales of Keune products outside permitted channels.

104. Keune promptly raised these issues with Riley in writing, identifying specific violations and demanding corrective action.

105. Over the ensuing months, Keune repeatedly communicated with Riley regarding these unauthorized sales.

106. In addition to making unauthorized sales directly to customers, Keune USA also learned that Riley was making unauthorized sales through sub-distributors—some of whom were not even approved by Keune—including by permitting and encouraging its sub-distributors to make unauthorized sales and not requiring its sub-distributors to comply with the sales limitations in the Agreement.

107. Equally concerning is that Keune learned that Riley was attempting to secure credits for some of these unauthorized sales through Keune's rewards program.

24

108. Keune afforded Riley multiple opportunities to cure these breaches, warning that Riley's noncompliance would jeopardize its status as an authorized distributor under the Agreement.

109. Riley failed to cure, however, and these unauthorized practices continued.

110. Further, despite Keune USA's demands, Riley failed to retrieve the product that Riley sold through unauthorized channels, which Riley was obligated to do under the Agreement to protect Keune's brand.

111. As these unauthorized sales came into focus through Keune USA's investigation, a financial audit revealed that Riley fell below its obligation to purchase and pay for 45% of its 2025 MPR within the first six months of the year, by June 2025.

112. Specifically, Riley's 2025 MPR was set at $1,284,000 as reflected in the February 24, 2025 correspondence that Keune USA sent to Missad when he was still serving as WBS's CEO. A true and correct copy of this MPR correspondence is attached hereto as **_Exhibit 2_**.

113. Pursuant to the Agreement, Riley was thus obligated to purchase and pay for 45% of this sum ($577,800) within the first six months of the year.

114. As of June 30, 2025, however, Riley had only purchased and paid for $497,770 of Keune inventory.

115. Riley's failure to satisfy its 2025 MPR vested Keune USA with the right to immediately terminate the Agreement for cause and without any right to cure.

116.    Thus, after assessing its options and the deterioration of the parties' relationship, Keune USA exercised its rights to terminate the Agreement for cause, as specified in its December 8, 2025, correspondence to Riley. A true and correct copy of this Termination Letter is attached hereto as ***Exhibit 3***.

117.    Keune USA immediately acted to mitigate any disruption precipitated by Riley's termination, and sought to repurchase Riley's remaining inventory, so the parties could effectuate an orderly winddown and transition of their relationship, consistent with the Agreement and industry practice.

### *Rather Than Comply With The Agreement, Defendants Wantonly Violated Keune's Rights*

118.    The Agreement's termination also ended Riley's right—as well as its sub-distributors' rights—to sell Keune's products and use Keune's Marks in commerce. (Agmt. §§ 9-10.)

119.    Indeed, Keune USA made this point abundantly clear in its Termination Letter:

> In connection with this termination, Keune is cancelling all pending but unshipped orders, and no additional product orders will be accepted. As of the termination effective date, **all rights previously granted** to Riley to market, sell, advertise, or distribute Keune products are **immediately revoked and relinquished**.

(Ex. 3.)

120.    Rather than honor this prohibition, however, Riley engaged in sharp dealing by continuing to sell Keune's product in a fire sale—both directly and through its sub-distributors—thereby flouting the obvious negative impact this would have on Keune's brand and promoting confusion in the marketplace.

26

121.   Riley's conduct was neither accidental nor uninformed.

122.   Indeed, Hanson openly touted that Defendants would illegally sell off Riley's remaining inventory to the detriment of Keune's brand unless Keune USA kowtowed to Defendants' demands, as reflected in Hanson's December 11, 2025, email (the "December 11 Email"):

> If we can't agree on the terms above, we'll have no choice but to keep the stock and start an orderly wind-down through normal industry channels while protecting our rights legally. As well, we are going to take action to protect our company's name, which is currently being disparaged in the market. We don't want to go there — so let's end twelve strong years on a positive note instead, as you suggest.
>
> Hunter
>
> ----
> **Hunter Hanson**
> Winfield Equity
> 484-343-5542
> hunter@winfieldequity.com

123.   As Hanson's email demonstrates—despite his active operation of Riley and WBS—Hanson was communicating with Keune USA through his Winfield email address; the PE Firm that created WBS and WBH to acquire Riley and other beauty distributors, and which actually serves as the Winfield Partners' employer.

124.   As the December 11 Email also reflects, Brenes and Jensen were copied on this correspondence using their Winfield email addresses, which further evidences their oversight, operation, and control of Riley's affairs through Winfield.

125.   Eight days later, on December 19, 2025, Keune USA learned that one of Riley's sub-distributors in Louisiana, known as Life of Riley Thibodaux ("LOR

Thibodaux"), was also continuing to sell Keune's products, which was promoting confusion amongst the salons in that portion of Riley's former Territory.

126. Thus, Keune USA reiterated to Defendants the need to repurchase the remaining inventory of Keune's products from Riley and its sub-distributors to curb unauthorized sales and requested Chase Ridenour, Riley's Director of Operations, to send an inventory report to derive an accurate repurchase price that could be offset against the A/R that Riley owed Keune.

127. On December 22, 2025, Ridenour furnished the requested inventory report, which demonstrated that Riley's warehouse in Largo, Florida, was holding $107,430.43 in Keune inventory.

128. Following the Christmas Holiday, Keune USA followed up with Riley regarding the inventory and raised additional concern regarding a text message marketing campaign of which it learned about, in which Riley was selling its remaining inventory at significant discounts.

129. On information and belief, based on inventory figures that Riley regularly provided to Keune USA throughout the parties' relationship, it appeared that Riley sold in excess of $100,000 in Keune product following termination of the Agreement, which was distributed from Riley's warehouse in Largo, Florida, at the direction, and with the approval of, the Winfield Partners and the Winfield Entities.

28

130. Indeed, consistent with the December 11 Email, Riley flouted the Agreement's prohibitions and Keune's intellectual property rights, thereby sowing confusion in the marketplace.

131. Indeed, even as of January 8, 2026—and despite Keune USA's demands to stop illegally selling the remaining Keune inventory in Riley's possession—Keune's products remained advertised and available for purchase on Riley's website, including to Florida customers, as reflected in the exemplar screenshot reflected below:



132. In fact, Riley was actively selling approximately *one-hundred ninety* (190) Keune products on Riley's website, prominently featuring the Keune Marks as if Riley remained an authorized distributor with authority to sell Keune's products. A true and correct copy of the report detailing the Keune product that Riley was illegally selling on its website as of January 8, 2026, is attached hereto as ***Exhibit 4***.

133. On information and belief, Defendants, including Winfield, acting through the Winfield Partners, directed, authorized, and/or ratified Riley's post-termination sale of Keune products, including products maintained at Riley's Largo,

Florida warehouse and sold or offered for sale to Florida salon customers directly, through Riley, through the Riley website, and through Riley's sub-distributors, while using the Keune Marks and with knowledge that Riley's authorization to sell Keune products and use the Keune Marks had been terminated.

134.    On information and belief, Riley was also offering these Keune products at significant discounts to prospective customers. Thus, not only was Riley selling Keune product through unauthorized channels, it was undercutting Keune USA's pricing structure that other dealers were offering.

135.    On information and belief, despite removing Keune's product from its website, Riley continues to advertise, market, and sell the remaining Keune products in Riley's inventory, albeit without license or permission, over Keune's objections, and in violation of the Agreement.

136.    Riley's improper use of the Keune Marks and its ongoing advertisement, marketing, and sale of Keune products—both directly and through its sub-distributors—has sowed confusion in the marketplace, whereby customers were being misled to believe that Riley and its sub-distributors were authorized distributors of Keune products with full authority to sell these products notwithstanding termination of the Agreement.

137.    Hanson—in his capacity as Riley's manager, a "Partner" in both WBS and Winfield, and given his direct and/or indirect ownership and control of WBS and WBH through Winfield—authorized, directed, controlled, ratified, participated in,

and was a motivating force behind Riley's infringement and all other wrongful conduct alleged herein, including by: sending his December 11 Email in which he threatened to continue selling Keune's products despite Riley's termination as a Keune USA distributor; directing post-termination sales he foreshadowed in his email; controlling Riley's marketing decisions, including the products being sold on Riley's website; directing and authorizing Riley's sub-distributors to continue advertising and selling Keune products post-termination; and approving the fire sale of Keune products after termination.

138.   Jensen—in his capacity as one of Riley's managers, a member of WBS's Board, a member of WBH's Board, and given his direct and/or indirect ownership and control of these entities through Winfield—authorized, directed, controlled, ratified, participated in, and was a motivating force behind Riley's infringement and all other wrongful conduct alleged herein, including by: directing post-termination sales given his knowledge of Hanson's December 11 Email on which Jensen was copied; controlling Riley's marketing decisions, including the products being sold on Riley's website; directing and authorizing Riley's sub-distributors to continue advertising and selling Keune products post-termination; and approving the fire sale of Keune products after termination.

139.   Brenes—in his capacity as one of Riley's managers, WBS's President, a member of WBH's Board, and given his direct and/or indirect ownership and control of these entities through Winfield—authorized, directed, controlled, ratified, participated in, and was a motivating force behind Riley's infringement and all other

31

wrongful conduct alleged herein, including by: directing post-termination sales given his knowledge of Hanson's December 11 Email on which Brenes was copied; controlling Riley's marketing decisions, including the products being sold on Riley's website; directing and authorizing Riley's sub-distributors to continue advertising and selling Keune products post-termination; and approving the fire sale of Keune products after termination.

140. Indeed, Hanson flatly told Keune USA that Riley was going to continue to sell off its remaining Keune inventory in his December 11 email on which Brenes and Jensen were copied.

141. By virtue of the Winfield Entities' corporate structure, Jensen, Brenes, and Hanson also exercise dominion and control over WBS, Riley's other manager as reflected on the Florida Secretary of State's website.

142. WBS—as Riley's parent entity—authorized, directed, controlled, ratified, participated in, and was a motivating force behind Riley's infringement and all other wrongful conduct alleged herein, including by: directing post-termination sales; controlling Riley's marketing decisions; operating Riley's website; directing and authorizing Riley's sub-distributors to continue advertising and selling Keune products post-termination; and approving the fire sale of Keune products after termination.

143. WBH—as WBS's parent entity, which in turn owns Riley—authorized, directed, controlled, ratified, participated in, and was a motivating force behind Riley's infringement and all other wrongful conduct alleged herein, including by: directing

post-termination sales; controlling Riley's marketing decisions; operating Riley's website; directing and authorizing Riley's sub-distributors to continue advertising and selling Keune products post-termination; and approving the fire sale of Keune products after termination.

144. As noted above, Winfield is the affiliated PE firm that is owned by Winfield Partners, and where each of them is employed.

145. Winfield also had the right and ability to supervise and control Riley's business activities, including its sales and distribution operations, and derived a financial benefit from Riley's continued sales of Keune products following termination of the Agreement. Indeed, Winfield created WBS and WBH in advance of the Riley acquisition and to effectuate its rollup strategy given its investment into the beauty distributor market.

146. WBH is the corporate parent that wholly owns WBS, which operates Riley, and is also owned and/or controlled by Winfield Partners, whether directly or through Winfield.

147. WBH had the right and ability to supervise and control Riley's significant business activities, including its sales and distribution operations, and derived a financial benefit from Riley's continued sales of Keune products following termination of the Agreement.

148.   All Defendants knowingly and intentionally permitted, directed, and encouraged distribution and sale of the Keune products, both directly and through sub-distributors, after the termination of the Agreement on December 8, 2025.

149.   The continued use by a previously authorized seller such as Riley falsely implies ongoing authorization and affiliation, which promotes a likelihood of confusion in the marketplace.

150.   As the Eleventh Circuit put it, "common sense compels the conclusion" that a "strong risk of consumer confusion arises when a terminated [franchisee] continues to use the former franchisor's trademarks," because consumers "automatically would associate the trademark user with the registrant and assume that they are affiliated." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492-93 (11th Cir. 1983). It follows that "ex-licensees are not permitted to sell off their inventory." *Nutradose Labs, LLC v. Bio Dose Pharma, LLC*, 710 F. Supp. 3d 1200, 1230 (S.D. Fla. 2024) (citing *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 153 (3d Cir. 1984)).

151.   In "holdover" situations like this, the likelihood of confusion is obvious from the fact of continued unauthorized use. S*ee, e.g.*, *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1190 (6th Cir. 1997) (holding that "proof of continued, unauthorized use of an original trademark by one whose license to use the trademark had been terminated is sufficient to establish 'likelihood of confusion'") (citing *Burger King Corp.*, 710 F.2d at 1492-93); *see also Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 464 (6th Cir. 2022) (categorical rule in holdover cases because it is

"obvious" consumers will believe continued operations remain affiliated); *accord Molzan v. Bellagreen Holdings, L.L.C.*, 112 F.4th 323, 2024 WL 3755615, at \*4 (5th Cir. 2024) (same); *see also Harley-Davidson Motor Co. v. Iron Eagle of Cent. Fla., Inc.*, 973 F. Supp. 1421, 1425 (M.D. Fla. 1997) (use of trademarks in a manner that causes customers to believe a seller is an "authorized dealer" supports liability under the Lanham Act).

152.   Riley's past and, on information and belief, continued sales, marketing, and text message campaigns to salon customers and others after written termination of the Agreement—and after express notice that it retains no remaining rights to sell Keune's products or use Keune Marks—was not an oversight; it was deliberate, unauthorized, and willful exploitation of Keune IP's trademarks that created, and likely continues to create, a likelihood of confusion in the marketplace, including through Riley's ongoing association with Keune USA, the only Keune entity authorized to contract and grant distribution rights of Keune's products with various regional distributors.

### COUNT I: TRADEMARK INFRINGEMENT
### IN VIOLATION OF 15 U.S.C. § 1114
**(Keune IP Against Riley, WBS, & The Winfield Partners)**

153.   Keune IP repeats and realleges Paragraphs 1-152 as if fully set forth herein.

154.   Keune IP's claim for trademark infringement arises under the Lanham Act, 15 U.S.C. § 1114.

155. As detailed above, Keune IP is the registrant of various Keune trademarks, including the Registered Marks, which the Keune family of companies regularly use in commerce, including Keune USA, which operates as the exclusive importer and distributor of Keune's hair products throughout the United States.

156. The Keune Marks have, over many years, become associated with and identify Keune's goods and products, through the continuous use in commerce and promotion of the Keune Marks by Keune.

### *Riley Is Directly Responsible For Trademark Infringement*

157. As detailed above, Keune USA granted Riley a limited license to use the Keune Marks in the promotion and sale of Keune's products pursuant to the Agreement.

158. That said, Riley's ability to use the Keune Marks ceased when the Agreement was terminated.

159. Nonetheless, Hunter flatly told Keune that Riley would continue to sell off Riley's inventory of Keune's products—naturally using the Keune Marks along the way—notwithstanding the termination of the Agreement.

160. Just as Hunter threatened, Keune then learned that Riley continued to sell Keune's products, using the Keune Marks owned by Keune IP—without Keune IP's authorization or permission.

161. Specifically, Riley continued to use Keune's Marks in marketing campaigns through various media, as well as by selling, advertising, and displaying

Keune's Marks on its website in connection with the promotion and sale of the Keune products in Riley's inventory following the termination of the Agreement.

162. Accordingly, Riley has intentionally engaged in conduct that constitutes trademark infringement, which is prohibited under the Lanham Act.

163. Specifically, by holding over and continuing to advertise, market, distribute, offer for sale, and sell Keune products despite the termination of Riley's rights to do so, Riley held out to the public that Riley was an authorized distributor of Keune products with the right to distribute these products in commerce.

164. Riley's wrongful, infringing, and violative conduct has interfered with Keune's intellectual property rights and promoted a likelihood of consumer confusion in the marketplace regarding Riley's relationship with the Keune family of companies, through Riley's improper use of Keune IP's trademarks.

165. Accordingly, Riley violated the Lanham Act as a result of the unlawful conduct described herein and its managers that exercise dominion and control over Riley's affairs—that is, WBS, Brenes, Jensen, and Hanson—are directly responsible for Riley's malfeasance.

### WBS & The Winfield Partners Are Directly Liable For Trademark Infringement

166. As the Eleventh Circuit has recognized, "a corporate officer who directs, controls, participates in, ratifies or is a moving force behind an infringing activity is personally liable" for trademark infringement without the necessity of piercing the corporate veil. *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1994)

(upholding liability of corporate officers for trademark infringement and false designation of origin under § 1125(a) based on their having directed, controlled, ratified, participated in or been the moving force behind the violations); *see also Nutradose Labs, LLC v. Bio Dose Pharma*, LLC, 710 F. Supp. 3d 1200, 1226-27 (S.D. Fla. 2024) (stating that "[n]atural persons, as well as corporations, may be liable for trademark infringement under the Lanham Act" and holding that "[p]ersonal liability for trademark infringement attaches to agents of a company if the individual 'actively and knowingly caused the infringement,' such that he was 'a moving, active, conscious force'") (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477-78 (11th Cir. 1991)).

167.   Applied here, WBS and each of the Winfield Partners—Jensen, Brenes, and Hanson—each serve as managers of Riley. In this capacity, each manager exercises control over Riley's corporate affairs, and they were the moving force behind Riley's trademark infringement, in violation of Keune IP's rights.

168.   Accordingly, the Winfield Partners—through their exercise and control over Riley as managers *and* through their exercise and control over WBS, Riley's other manager—were the "moving force" behind Riley's infringing activities, thereby rendering WBS and the Winfield Partners directly liable for Riley's infringing activities, which they directed, authorized, ratified, and controlled.

169.   Riley, WBS, & The Winfield Partners, therefore, are using the Registered Marks in connection with the sale, offering for sale, distribution, or advertising of

goods and services in a manner likely to cause confusion or mistake, or to deceive as to the source or origin of such goods and services.

170.    The conduct of Riley, WBS, & The Winfield Partners is causing and will cause confusion among the members of the relevant consuming public and is causing irreparable and immediate injury to Keune IP.Keune IP has suffered damages as a result of these Defendants' violation of the Lanham Act and therefore seeks all relief available under this statutory scheme, including but not limited to enhanced treble damages, and an award of attorneys' fees in addition to its compensatory damages.

### COUNT II: CONTRIBUTORY TRADEMARK INFRINGEMENT THROUGH SUB-DISTRIBUTORS IN VIOLATION OF 15 U.S.C. § 1114
**(Keune IP Against Riley, WBS, & The Winfield Partners)**

171.    Keune IP repeats and realleges Paragraphs 1-152 as if fully set forth herein.

172.    A claim for contributory trademark infringement has two elements: "(1) a person or entity commits direct trademark infringement under the Lanham Act; and (2) the defendant (a) "intentionally induces" the direct infringer to commit infringement, (b) supplies a "product" to the direct infringer whom it "knows" is directly infringing (actual knowledge), or (c) supplies a "product" to the direct infringer whom it "has reason to know" is directly infringing (constructive knowledge)." *Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1312 (11th Cir. 2019).

173. Pursuant to the Agreement, once Riley's status as an authorized Keune distributor was terminated, Riley's sub-distributors' status as an authorized distributor of Keune's products also terminated.

174. Keune made this point explicit in Keune USA's December 8, 2025, Termination Letter:

> In connection with this termination, Keune is cancelling all pending but unshipped orders, and no additional product orders will be accepted. As of the termination effective date, **all rights previously granted** to Riley to market, sell, advertise, or distribute Keune products are **immediately revoked and relinquished**.

175. Nonetheless, on December 19, 2025, Keune USA learned that one of Riley's Louisiana's sub-distributors—LOR Thibodaux—continued to sell off its Keune inventory, which was sowing confusion in the marketplace.

176. On information and belief, Riley—which is managed by WBS and the Winfield Partners—directed _all_ its sub-distributors, not just LOR Thibodaux, to continuing selling their remaining stock of Keune products.

177. On information and belief, Riley intentionally induced its sub-distributors to continue selling their respective quantities of Keune products that they were holding, so that these sub-distributors could use these proceeds to satisfy any A/R that each sub-distributor owed to Riley.

178. As detailed above, Riley is controlled by WBS and the Winfield Partners, each of whom serve as managers of Riley, who jointly exercise dominion and control over Riley's affairs.

40

179.    Accordingly, Riley, WBS, and the Winfield Partners are thus also liable for contributory infringement for inducing, promoting, and enabling the trademark infringement by Riley's sub-distributors, who also continued to advertise and sell Keune products after Riley's termination, of which these defendants had actual knowledge and which they failed to stop despite having the ability to do so.

180.    Keune IP has suffered damages as a result of these defendants' violation of the Lanham Act and therefore seek all relief available under this statutory scheme, including but not limited to enhanced treble damages, and an award of attorneys' fees in addition to its compensatory damages.

### COUNT III: CONTRIBUTORY TRADEMARK INFRINGEMENT THROUGH RILEY IN VIOLATION OF 15 U.S.C. § 1114
**(Keune IP Against WBS & The Winfield Partners)**

181.    Keune IP repeats and realleges Paragraphs 1-152 as if fully set forth herein. This count is alleged against WBS and the Winfield Partners in the alternative to Counts I and II.

182.    As detailed in Counts I and II, WBS and the Winfield Partners each serve as managers of Riley, who directly infringed Keune IP's trademarks (Count I) and contributorily infringed on Keune IP's trademarks by actively inducing Riley's sub-distributors to continue to sell through the Keune products that remained in these sub-distributors' inventories after the Agreement was terminated (Count II).

41

183.   In their capacities as Riley's managers, WBS, Hanson, Brenes, and Jensen each exercise control over Riley's affairs and were responsible for Riley's infringement as detailed above.

184.   Thus, if WBS and the Winfield Partners are not directly liable for Riley's trademark infringement as alleged in Counts I and II, then these defendants are contributorily liable for Riley's infringing acts because they intentionally induced Riley to violate Keune IP's trademark rights under the Lanham Act.

185.   Keune IP has suffered damages as a result of these defendants' violation of the Lanham Act and therefore seek all relief available under this statutory scheme, including but not limited to enhanced treble damages, and an award of attorneys' fees in addition to its compensatory damages.

### COUNT IV: VICARIOUS TRADEMARK INFRINGEMENT IN VIOLATION OF 15 U.S.C. § 1114
**(Keune IP Against the Winfield Partners & Winfield Entities)**

186.   Keune IP repeats and realleges Paragraphs 1-152 as if fully set forth herein.

187.   As alleged in Count I, Riley infringed the Registered Marks. Keune IP asserts this claim against WBS, WBH, and Winfield (as the Winfield Entities) as well as Hanson, Brenes, and Jensen (as the Winfield Partners) for vicarious liability for Riley's infringement of the Registered Marks.

188.   To plead a viable claim for vicarious trademark infringement, this district has held that the plaintiff must allege that that a defendant: (i) had the right and ability

42

to supervise the infringing activity or infringer; and (ii) possessed a direct financial interest in profiting from the infringement. *Slep-Tone Ent. Corp. v. 4145 Pete's Place, Inc.*, No. 812CV01883JDWAEP, 2013 WL 12156819, at *2 (M.D. Fla. Oct. 1, 2013) (collecting authority).

189.  As noted above, Keune IP is the holder of trademarks that Riley infringed through its post-termination sale of Keune's product as well as through its active inducement of its sub-distributors to continue to sell Keune's products following termination of the Agreement.

190.  Riley is a wholly owned subsidiary of WBS that, in turn, is a wholly owned subsidiary of WBH.

191.  Riley's managers are WBS, Hanson, Brenes, and Jensen.

192.  Additionally, Brenes averred in the *Missad* Litigation that he is the President of WBS and a member of WBH's Board of Directors.

193.  Likewise, Jensen also averred in the *Missad* Litigation that he is a member of WBS's Board of Directors and a Director of WBH.

194.  On information and belief, Hanson was also appointed as an officer and director of WBS and WBH given the control he exercised over Riley and WBS once he joined Winfield in November 2023.

195.  As noted above, however, Hanson, Brenes, and Jensen—as the Winfield Partners—are not W-2 employees of Riley, WBS, or WBH.

196.    Rather, each of the Winfield Partners are identified as governors of Winfield and, on information and belief, are W-2 employees of Winfield; the PE firm they own and operate, which made the investment into the beauty product distribution market through their creation of WBS/WBH and acquisition of various distributors, including Riley.

197.    On information and belief, the income that Riley generates from the sale of its goods, including from sales of Keune's products that violated Keune IP's Marks, flows to WBS, which in turn flows to WBH.

198.    On information and belief, this investment structure ultimately redounds to Winfield's benefit as the PE company that made the investment in the first instance, whether directly (as an owner of WBH) or indirectly (vis-à-vis the Winfield Partners).

199.    Given the Winfield Partners' roles within each company—specifically, through their respective roles as Riley managers, WBS corporate officers and directors, WBH directors, and Winfield governors, owners, and employees—Hanson, Brenes, and Jensen each had the right and ability to supervise Riley.

200.    Likewise, WBS, WBH, and Winfield each had the right and ability to supervise Riley's infringing conduct because they are parent and/or affiliate entities that are operated and controlled by the Winfield Partners who in turn control Riley.

201.    Further, the Winfield Partners, WBS, WBH, and Winfield each possessed a direct financial interest in Riley's infringing conduct because continuing to sell Riley's inventory of Keune's product generated more money for Riley, which

redounded to the pecuniary benefit of the Winfield Entities and the Winfield Partners that exercise management and control over each business.

202.    Accordingly, the Winfield Partners and the Winfield Entities are each vicariously liable for Riley's infringement of Keune IP's trademarks in an amount to be determined at trial.

203.    Keune IP has suffered damages as a result of these defendants' violation of the Lanham Act and therefore seek all relief available under this statutory scheme, including but not limited to enhanced treble damages, and an award of attorneys' fees in addition to its compensatory damages.

### COUNT V: UNFAIR COMPETITION
### IN VIOLATION OF 15 U.S.C. § 1125(a)
### (Plaintiffs Against Riley, WBS, & The Winfield Partners)

204.    Keune IP and Keune USA repeat and reallege Paragraphs 1-152 as if fully set forth herein.

205.    The Plaintiffs' claims for unfair competition arise under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

206.    Section 1125(a) provides that "[a]ny person who, on or in connection with any goods or services, . . . uses in commerce any . . . false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the *affiliation*, *connection*, or *association* of such person with another person, or as to the origin, *sponsorship*, or *approval* of his or her goods, services, or commercial activities by another

45

person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1)(A) (emphasis added).

207. Section 1125(a) proscribes a variety of malfeasance deemed unfair competition under the Lanham Act and protects both registered and unregistered marks. *Planetary Motion, Inc. v. Techsplosion*, 261 F.3d 1188, 1193 (11th Cir.2001).

208. As detailed above, Keune IP is the registrant of various Keune trademarks, which the Keune family of companies regularly use in commerce, including Keune USA, which operates as the exclusive importer and distributor of Keune's hair products throughout the United States.

209. The Keune Marks have, over many years, become associated with and identify Keune's goods and products, through the continuous use in commerce and promotion of the Keune Marks by Keune.

210. Further, given Keune USA's status as the exclusive importer and distributor of Keune's hair products in North America—with the concomitant authority to use the Keune Marks in commerce and contract with regional distributors throughout the United States—it follows that any U.S. distributor selling Keune's products is necessarily holding itself out as being affiliated with Keune USA; that is, the only access point through which Keune's products enter the U.S. market.

*Riley Is Directly Responsible For Unfair Competition*

211.   As detailed above, Keune USA granted Riley a limited license to use the Keune Marks in the promotion and sale of Keune's products pursuant to the Agreement.

212.   That said, Riley's ability to use the Keune Marks ceased when the Agreement was terminated.

213.   Nonetheless, Hunter flatly told Keune that Riley would continue to sell off Riley's inventory of Keune's products—naturally using the Keune Marks along the way and continuing to falsely represent itself as being affiliated with Keune USA—notwithstanding the termination of the Agreement.

214.   Just as Hunter threatened, Keune then learned that Riley continued to sell Keune's products, falsely associating itself as an authorized distributor of Keune USA and using the Keune Marks owned by Keune IP—all without Plaintiffs authorization or permission.

215.   Specifically, Riley continued to use Keune's Marks in marketing campaigns through various media, as well as by selling, advertising, and displaying Keune's Marks on its website in connection with the promotion and sale of the Keune products in Riley's inventory following the termination of the Agreement.

216.   Of course, because only *authorized* Keune distributors—who have a valid, ongoing contractual relationship with Keune USA—are permitted to sell Keune products (and use Keune IP's Marks in furtherance thereof), Riley's ongoing sale of

Keune's products following termination of the Agreement was false and misleading, insofar as caused confusion, mistake, and/or intended to deceive regarding the "*affiliation*, *connection*, or *association* of [Riley] with [Keune USA and Keune IP], or as to the origin, *sponsorship*, or *approval* of [Riley's] goods, services, or commercial activities by" Plaintiffs.

217.   Accordingly, Riley has intentionally engaged in conduct that constitutes unfair competition prohibited under the Lanham Act.

218.   Specifically, by holding over and continuing to advertise, market, distribute, offer for sale, and sell Keune products despite the termination of Riley's rights to do so, Riley held out to the public that Riley was an authorized distributor of Keune products with the right to distribute these products in commerce.

219.   Riley's post-termination sales of Keune's product constitute misleading representations of fact, which have caused confusion and/or mistake as to the affiliation, connection, or association of Riley and the products Riley sells with Keune USA and Keune's products, or as to the origin, sponsorship, or approval of the goods, services, or commercial activities of Defendants.

220.   Defendants' wrongful, infringing, and violative conduct has interfered with Keune USA's relationship with its authorized distributors in Florida and in Riley's other former territories, as well as the customers who buy Keune's product through authorized distributors in Riley's former sales territories, including by diverting sales away from its authorized distributors and confusing customers and

48

prospective customers regarding Riley's relationship with the Keune family of companies, through Riley's improper use of Keune IP's trademarks.

### *WBS & The Winfield Partners Are Directly Liable For Unfair Competition*

221.    WBS and each of the Winfield Partners—Jensen, Brenes, and Hanson— each serve as managers of Riley. In this capacity, each manager exercises control over Riley's corporate affairs, and they were the moving force behind Riley's misleading post-termination sales of Keune's products, in violation of Keune IP's rights and constituting unfair competition under § 1125(a).

222.    Accordingly, the Winfield Partners—through their exercise and control over Riley as managers *and* through their exercise and control over WBS, Riley's other manager—were the "moving force" behind Riley's unfair competition, thereby rendering WBS and the Winfield Partners directly liable for Riley's unfair competition, which they directed, authorized, ratified, and controlled.

223.    Defendants' wrongful, infringing, and violative conduct has interfered with Keune's intellectual property rights and promoted a likelihood of consumer confusion in the marketplace regarding Riley's relationship with the Keune family of companies and as to the origin, sponsorship, or approval of the goods, services, or commercial activities of Defendants, through Riley's improper use of Keune IP's trademarks and false association with Keune USA, thereby constituting infringement and unfair competition under § 1125(a).

224.   Keune USA has suffered damages as a result of these Defendants' violation of § 1125 and therefore seeks all relief available under this statutory scheme, including but not limited to enhanced treble damages, and an award of attorneys' fees in addition to its compensatory damages.

225.   Keune IP has suffered damages as a result of these Defendants' violation of § 1125 and therefore seeks all relief available under this statutory scheme, including but not limited to enhanced treble damages, and an award of attorneys' fees in addition to its compensatory damages.

### COUNT VI: CONTRIBUTORY UNFAIR COMPETITION THROUGH SUB-DISTRIBUTORS IN VIOLATION OF 15 U.S.C. § 1125(a)
**(Plaintiffs Against Riley, WBS, & The Winfield Partners)**

226.   Plaintiffs repeat and reallege Paragraphs 1-152 as if fully set forth herein.

227.   Riley, WBS and The Winfield Partners are liable for contributory infringement of the Registered Marks.

228.   A claim for contributory false designation of origin and false advertising requires showing that third party directly engaged in unfair competition that harmed the plaintiff and that the defendant contributed to that conduct either by knowingly inducing or causing the conduct or by materially participating in it. *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015); *see also Coach, Inc. v. Farmers Mkt. & Auction*, 881 F. Supp. 2d 695, 705 (D. Md. 2012).

229. Pursuant to the Agreement, once Riley's status as an authorized Keune distributor was terminated, Riley's sub-distributors' status as an authorized distributor of Keune's products also terminated.

230. Keune made this point explicit in Keune USA's December 8, 2025 Termination Letter:

> In connection with this termination, Keune is cancelling all pending but unshipped orders, and no additional product orders will be accepted. As of the termination effective date, **all rights previously granted** to Riley to market, sell, advertise, or distribute Keune products are **immediately revoked and relinquished**.

231. Nonetheless, on December 19, 2025, Keune USA learned that one of Riley's Louisiana's sub-distributors, LOR Thibodaux, continued to sell off its Keune inventory, which was sowing confusion in the marketplace.

232. On information and belief, Riley—which is managed by WBS and the Winfield Partners—directed _all_ its sub-distributors, not just LOR Thibodaux, to continuing selling their remaining stock of Keune products.

233. On information and belief, Riley intentionally induced its sub-distributors to continue selling their respective quantities of Keune products that they were holding, so that these sub-distributors could use these proceeds to satisfy any A/R that each sub-distributor owed to Keune.

234. As detailed above, Riley is controlled by WBS and the Winfield Partners, each of whom serve as managers of Riley, who jointly exercise dominion and control over Riley's affairs.

51

235.    Accordingly, Riley, WBS, and the Winfield Partners are thus also liable for contributory unfair competition as a result of promoting, and enabling the unfair competition through false advertising and false association by Riley's sub-distributors, who continued to advertise and sell Keune products after Riley's termination, of which these defendants had actual knowledge and which they failed to stop despite having the ability to do so.

236.    Keune IP has suffered damages as a result of these defendants' violation of the Lanham Act and therefore seeks all relief available under this statutory scheme, including but not limited to enhanced treble damages, and an award of attorneys' fees in addition to its compensatory damages.

237.    Keune USA has suffered damages as a result of these defendants' violation of the Lanham Act and therefore seeks all relief available under this statutory scheme, including but not limited to enhanced treble damages, and an award of attorneys' fees in addition to its compensatory damages.

### COUNT VII: CONTRIBUTORY UNFAIR COMPETITION THROUGH RILEY IN VIOLATION OF 15 U.S.C. § 1125(a)
**(Plaintiffs Against WBS & The Winfield Partners)**

238.    Plaintiffs repeat and reallege Paragraphs 1-152 as if fully set forth herein. This count is alleged against WBS and the Winfield Partners in the alternative to the claims against them in Counts V and VI.

239.    WBS and the Winfield Partners each serve as managers of Riley, who directly infringed Keune IP's trademarks (Count I); contributorily infringed on Keune

52

IP's trademarks by actively inducing Riley's sub-distributors to continue to sell through the Keune products that remained in these sub-distributors' inventories after the Agreement was terminated (Count II); directly engaged in unfair competition through false advertising and false designation of good and services (Count V); and who engaged in contributory unfair competition through false advertising and false designation by actively inducing Riley's sub-distributors to continue to sell through the Keune products that remained in these sub-distributors' inventories after the Agreement was terminated (Count VI).

240. In their capacities as Riley's managers, WBS, Hanson, Brenes, and Jensen each exercise control over Riley's affairs and were responsible for Riley's infringement as detailed above.

241. Thus, if WBS and the Winfield Partners are not directly liable for Riley's unfair competition as alleged in Counts V and VI, then these defendants are contributorily liable for Riley's wrongful acts of unfair competition because they intentionally induced Riley to violate Keune IP's trademark rights under the Lanham Act and to make false and misleading representations regarding Riley's ongoing affiliation and association with Keune USA, the exclusive importer of Keune's products in the United States.

242. Keune IP has suffered damages as a result of these defendants' violation of the Lanham Act and therefore seeks all relief available under this statutory scheme,

53

including but not limited to enhanced treble damages, and an award of attorneys' fees in addition to its compensatory damages.

243.   Keune USA has suffered damages as a result of these defendants' violation of the Lanham Act and therefore seeks all relief available under this statutory scheme, including but not limited to enhanced treble damages, and an award of attorneys' fees in addition to its compensatory damages.

## COUNT VIII: VICARIOUS UNFAIR COMPETITION IN VIOLATION OF 15 U.S.C. § 1125(a)
### (Plaintiffs Against the Winfield Partners & Winfield Entities)

244.   Plaintiffs repeat and reallege Paragraphs 1-152 as if fully set forth herein.

245.   Plaintiffs assert this claim against WBS, WBH, and Winfield (as the Winfield Entities) as well as Hanson, Brenes, and Jensen (as the Winfield Partners) for vicarious liability for Riley's unfair competition, as alleged in Count V.

246.   To plead a viable claim for vicarious trademark infringement, this district has held that the plaintiff must allege that that a defendant: (i) had the right and ability to supervise the infringing activity or infringer; and (ii) possessed a direct financial interest in profiting from the infringement. *Slep-Tone Ent. Corp. v. 4145 Pete's Place, Inc.*, No. 812CV01883JDWAEP, 2013 WL 12156819, at *2 (M.D. Fla. Oct. 1, 2013) (collecting authority). This doctrine of vicarious liability also applies to violations of § 1125. *See, e.g, Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 793 (6th Cir. 2015) (applying same test for vicarious infringement under § 1114 to claim of vicarious liability for false designation of origin under § 1125(a)).

54

247.    As noted above, Keune IP is the holder of trademarks that Riley infringed through its post-termination sale of Keune's product as well as through its active inducement of its sub-distributors to continue to sell Keune's products following termination of the Agreement.

248.    Also as noted above, Keune USA has the exclusive right to import, distribute, and sell Keune's products in the North American market and is authorized to use Keune's intellectual property, including Keune's trademarks, in connection with promoting the sale of Keune's hair products in the North American market.

249.    Riley is a wholly owned subsidiary of WBS that, in turn, is a wholly owned subsidiary of WBH.

250.    Riley's managers are WBS, Hanson, Brenes, and Jensen.

251.    Additionally, Brenes averred in the *Missad* Litigation that he is the President of WBS and a member of WBH's Board of Directors.

252.    Likewise, Jensen also averred in the *Missad* Litigation that he is a member of WBS's Board of Directors and a Director of WBH.

253.    On information and belief, Hanson was also appointed as an officer and director of WBS and WBH given the control he exercised over Riley and WBS once he joined Winfield in November 2023.

254.    As noted above, however, Hanson, Brenes, and Jensen—as the Winfield Partners—are not W-2 employees of Riley, WBS, or WBH.

55

255. Rather, each of the Winfield Partners are identified as governors of Winfield and, on information and belief, are W-2 employees of Winfield; the PE firm they own and operate, which made the investment into the beauty product distribution market through their creation of WBS/WBH and acquisition of various distributors, including Riley.

256. On information and belief, the income that Riley generates from the sale of its goods, including from sales of Keune's products that violated Keune IP's Marks and constitutes unfair competition, flows to WBS, which in turn flows to WBH.

257. On information and belief, this investment structure ultimately redounds to Winfield's benefit as the PE company that made the investment in the first instance, whether directly (as an owner of WBH) or indirectly (vis-à-vis the Winfield Partners).

258. Given the Winfield Partners' roles within each company—specifically, through their respective roles as Riley managers, WBS corporate officers and directors, WBH directors, and Winfield governors, owners, and employees—Hanson, Brenes, and Jensen each had the right and ability to supervise Riley.

259. Likewise, WBS, WBH, and Winfield each had the right and ability to supervise Riley's infringing and wrongful conduct described herein because they are parent and/or affiliate entities that are operated and controlled by the Winfield Partners who in turn control Riley.

260. Further, the Winfield Partners, WBS, WBH, and Winfield each possessed a direct financial interest in Riley's infringing conduct because continuing

56

to sell Riley's inventory of Keune's product generated more money for Riley, which redounded to the pecuniary benefit of the Winfield Entities and the Winfield Partners that exercise management and control over each business.

261. Accordingly, the Winfield Partners and the Winfield Entities are each vicariously liable for Riley's infringement of Keune IP's trademarks and false designation of origin and unfair competition under § 1125(a) in an amount to be determined at trial.

262. Keune IP has suffered damages as a result of these defendants' violation of the Lanham Act and therefore seek all relief available under this statutory scheme, including but not limited to enhanced treble damages, and an award of attorneys' fees in addition to its compensatory damages.

263. Keune USA has suffered damages as a result of these defendants' violation of the Lanham Act and therefore seek all relief available under this statutory scheme, including but not limited to enhanced treble damages, and an award of attorneys' fees in addition to its compensatory damages.

## COUNT IX: BREACH OF CONTRACT
### (Keune USA Against Riley)

264. Keune USA repeats and realleges Paragraphs 1-152 as if fully set forth herein.

265. Keune USA and Riley were parties to the Agreement, which is a valid, binding contract.

266.    The Agreement requires Riley to pay for all Products within 30 days of shipment. (Agmt., ¶ 5(b).)

267.    Riley's timely payment for the Products is a material term of the Agreement. (*Id.* § 8(b).)

268.    Riley agreed to pay all costs of collection and reasonable attorney's fees if payment is collected by Plaintiff through an attorney. (*Id.*)

269.    Riley owes $117,154.73 for Keune products it ordered from Keune USA which were delivered to Riley, but for which Riley has refused to timely pay within 30 days (the "Past Due Balance").

270.    Indeed, according to Keune USA's accounting records, the entirety of the Past Due Balance is more than 150 days overdue.

271.    Riley's failure to timely pay the Past Due Balance is a material breach of the Agreement.

272.    The Agreement prohibited Riley from selling Keune product outside of authorized territories and channels.

273.    As demonstrated above, however, Riley sold Keune products outside of authorized territories and channels.

274.    Under the terms of the Agreement, Riley lost any and all rights to market or sell Keune products when it was terminated as a distributor on December 8, 2025.

275. Nonetheless, Riley continued to advertise, market, hold out for sale, and sell Keune products after the termination of Riley's rights as a distributor on December 8, 2025.

276. By continuing to sell Keune products and use the Keune Marks, Riley violated and is continuing to violate the Agreement, which is a separate and independent material breach thereof. Accordingly, as a result of Riley's multiple material breaches of the Agreement, Keune is entitled to damages as a result of Riley's breach of contract in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, based on the above-referenced factual allegations, Keune demands:

A. That Defendants be required immediately to recall and deliver up and destroy, at their expense, all remaining advertisements or other promotional or written materials bearing the Keune Marks or any name or mark confusingly similar to the Keune Marks;

B. That, pursuant to 15 U.S.C. § 1117, Plaintiffs be awarded their damages, Defendants' profits, Plaintiffs' attorneys' fees and costs, and that this award of damages and profits be tripled pursuant to 15 U.S.C. § 1117;

C. That Keune USA be awarded damages for Riley's breach of contract, along with attorneys' fees as specified in the Agreement; and

D.    That Keune receives such other and further relief as this Court may deem just and proper.

Dated this 7th day of May, 2026.

THOMAS & LOCICERO PL

/s/ *James B. Lake*
James B. Lake (FBN 23477)
601 South Boulevard
Tampa, FL 33606
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
jlake@tlolawfirm.com
Secondary email: smaxey@tlolawfirm.com

BARTON CERJAK S.C.
James B. Barton (*pro hac vice* forthcoming)
313 North Plankinton Ave., Suite 207
Milwaukee, WI 53203
Telephone: (414) 877–0690
Facsimile: (414) 877-3039
Email: jbb@bartoncerjak.com